My name is Jeffrey Fazio, and my partner, Dina Micheletti, and I represent plaintiffs and appellants Richard Smith and Rebecca Klein. The principal focus of the argument here today is actually on the questions that we sought certification of before the California Supreme Court in our motion for that relief. Although there are a host of issues that surround all of the claims in the case, those two issues have been the source of confusion, a split of authority, and actually two decisions by the district court below on exactly the same issues, and turning out with two different conclusions that were polar opposites. The first question is whether a manufacturer intentionally conceals the existence of a defect that does not become manifest until after a warranty expires. Does California law require a plaintiff to demonstrate that the defect has the potential to injure or kill as a prerequisite to bringing a fraudulent concealment claim at common law or as a violation of the CLRA or the UCL? And the second question is, does California law require a court to dismiss a claim that a manufacturer has violated the UCL's fraud prong by concealing a defect that became manifest after the product's warranty expired because a consumer cannot, as a matter of law, reasonably expect the product to continue functioning after the warranty has expired? The parties, since the outset of this case, which was filed in January of 2006, after a substantial amount of investigation that preceded the filing, we consulted experts, we looked into the nature of the problem, we looked into, to the extent possible, what Ford knew and when it knew it, how many people were affected, the fact that the part was on back order. Shortly after the vehicle was introduced in August of 99, by November, these ignition locks in Ford Focus were already selling out, notwithstanding the fact that the engineering specifications for this part indicates, or doesn't just indicate, states that it's designed to last at least as long as the vehicle itself, that is 10 years, 150,000 miles, without service or maintenance. As we all know, if we drive a car, there's nothing that you need to do or can do, really, with an ignition lock. And as one of the Ford engineers who Ford had questioned internally about this issue when it was going on, he was surprised that it was happening so frequently with respect to the Focus and pointed out that his Model T had never had a problem with the ignition lock. Let me ask, just to make sure that we're all on the same page on this, this is not an alleged defect of a safety nature. This is not something that came to light as a result of consumers complaining that their cars were shooting through garages or stopping dead on the freeway or running away and going 99 miles an hour and they couldn't stop them, you know, the Toyota claims. This is nothing of that. This is more of a monetary issue, isn't it? Well, yes and no, Your Honor. It doesn't involve sudden acceleration or anything like that. Just people either couldn't start their car or couldn't turn it off. Yeah. The problem basically, and this is just to quickly summarize the nature of the complaints that were coming out, was that people were being stranded in harsh weather, in unsafe conditions. There were complaints that the engine could not be shut off. The Federal Motor Vehicle Safety Standards provide that if a car, for example, as this one, if you can't remove the key but still can turn the ignition, it leads to the possibility of a stranded. And as Alfa Romeo had pointed out in a voluntary safety recall that it conducted when it discovered the ignition switches in its vehicle, if this thing happens, you're stuck wherever you are. And if it happened on the side of the road, you're subject to being hit from behind, what have you. That led Alfa Romeo to conduct a safety recall in, I believe, 1989. I'm not quite sure on the date. So it's an indirect or safety issue. It's not a direct safety issue. Well, yeah. In the sense that it doesn't... It doesn't blow up the car. It doesn't cause injury to the... There's no immediate threat. It's a secondary threat that you're relying on. Right. It would be like a car's engine stalling on the highway. It may be that under the circumstances you're able to pull over to the side of the road. On the other hand, if it stalls in a road accident, that kind of thing... Are you talking about stalling? No, no, no. I'm saying... Oh, it's not about stalling. It's akin to that kind of thing. It's not very akin to, because it doesn't stop in the middle of the street suddenly, does it? No, Your Honor. What I was getting at is it's not like a sudden acceleration case where the car all of a sudden gets out of control. Yeah, but then don't tell us it's like something that it's not like. It's not something that stops suddenly in the middle of traffic. Either you can't turn it on or allegedly can't turn it off, but usually you can't turn it on or can't turn it off when you're in a stationary position out of traffic. That's right, Your Honor. But what I was getting at is that as Alfa Romeo had observed, the reason that they conducted a safety recall is because you can be stuck in the middle of traffic to the extent that you can't restart your car under conditions where, if it stalled, for example, and you tried to restart it and the ignition went... I think we've got your point. What we've described as a secondary safety issue. In fact, Ford marketed in its marketing materials... But the next step, then, is why do you think a secondary safety issue is covered under California law as an exception? That's, I think, the crux of the whole argument here, Your Honor. I think, as Judge Chesney observed the first time this issue was raised in the context of a motion for judgment on the pleadings, that there is no such thing as a rule in California that requires safety as a prerequisite to a fraud claim for manufacturers or anybody else. And as she observed then, it's a question that bears on materiality. Almost per se, if there's a safety question, that's material to most reasonable people. But it is not a prerequisite. It is just at the extreme end of the continuum where, on one end, there's no materiality whatsoever. For example, maybe a radio that doesn't tune in properly, to the other end of the spectrum where life and limb is at risk. And I forgot to mention, I wanted to reserve about five minutes for rebuttal. In any event, after we did the investigation, we filed the complaint. We voluntarily amended to provide more facts. Ford then moved for a more definite statement under Rule 9b. We went through that motion, filed the third amended complaint, which is the operative one here. And after Doherty issued, Ford moved for judgment on the pleadings. As I say, the Court observed at that time that safety was not a prerequisite. What she also observed, however, was that there was a lot of confusion stemming from Doherty, that the California Supreme Court would be the only one to resolve that confusion because there was a split of authority, and that we discussed during that hearing, which lasted a couple of hours, the fact that our case is nothing like Doherty or Barden. In a nutshell, in Doherty, they had 11 plaintiffs, seven of whom the allegation there was the defect was an oil seal that caused the engine to leak oil and ultimately destroy the engine. The problem with the complaint in Doherty was that seven of the 11 named plaintiffs had no oil leak. It never happened. The three others had an oil leak, but there was no damage at all. The seventh one did have oil leak and total engine failure. The problem with that, though, is that Honda had already conducted a service campaign that for the 1994 through 1997 accords and preludes, they were offering to replace the oil seals and reimburse, in some cases, for any expenditures that were incurred to repair. And that plaintiff, who had the failure, engine failure, actually owned one of the vehicles that was subject to that campaign. His only complaint was the adequacy of the notice. He said he didn't get it. And to save their case, the plaintiffs alleged that there was a safety defect. The Court did not raise that issue in Doherty. The plaintiffs did, and the Court asked, where is this? Where did you allege such facts? Not just saying that there's a safety problem, but establishing facts to prove it. The only thing they could point to was a boilerplate allegation in their punitive damage section of the complaint. The Court observed that that's not sufficient. That provided no facts bearing on safety. But it did not say that safety was a prerequisite. Finally, the Court also recognized at the beginning of the case that Honda was alleged to have known or should have known about this alleged defect at the time of the sale. So it was entirely possible that Honda was not aware of this alleged defect at the time they were selling these vehicles, which wouldn't have supported a claim in any event. Well, I suppose you can distinguish the case on those facts, but Doherty went on to make a whole bunch of law that's adverse to you. I don't believe so, Your Honor. I think that that's been the source of a lot of controversy. There are cases that say that, like Falk, like Tightsworth, like the Sony case, that are applicable here. One is exclusive knowledge of the operative facts, the material issue that is allegedly being concealed, and active concealment. That did – that, the Court did do. It made clear that the duty arises only when that occurs. The Supreme Court, on the other hand, has said that materiality is something that a reasonable person would have responded to by acting differently if they had known about the facts. We have done that here, unlike in Doherty, where it was unclear what the defect was, whether Honda knew about it, whether anybody had ever been damaged who wasn't the subject of the recall that they were already conducting in that case. We've proven that Ford knew about this before introducing the car in 1999, that it conducted – it assembled two special teams of engineers to deal with the problem. The way that they dealt with it, because the only way to completely solve it was to redesign the whole steering column. That wasn't going to happen because, essentially, you had to redesign the car, which wasn't going to happen until 2008. They decided to put that off and focus on the other problem that it had, which was the parts themselves. They were defective. They were wearing out quickly. This is a part, again, that's supposed to last for the life of the vehicle, and it wasn't anywhere near that. They recognized that that was why they were selling out. They were on back order before the end of 1999. So they assigned two special teams of engineers to modify the lock to the point where it would last until the warranty was over. They marked up the price of the replacement locks and explained when somebody asked about reducing the price that this was a source of revenue, that they were actually benefiting from the fact that they were selling so many replacement locks. They then went after the supplier, telling the supplier verbatim that these locks are not fit for their intended purpose, demanded and received $2 million from the supplier, even though it was Ford's design, and then went after the dealers. I spoke to the chief engineer of the lock division in deposition. He said that he went in Dearborn to a dealer, a Ford dealer, had their most experienced mechanic replace one of these things. It took more than two hours, and yet I asked him about a bulletin that came out from Ford that said the most you can charge is 1.1 hours for this. Did you find that the mechanic was doing anything that he shouldn't have done? No, it was reasonable, two point something hours. Well over two hours was reasonable. But the company decided that it didn't want to pay that. Did they extend that prohibition or the limitation to 1.1 hours to post-warranty claims that customers were paying for? No. Ford of Mexico was noting that they were replacing these locks between one and five times at $500 apiece when they were paying for the labor at Ford dealers, and that it was initially insisting that the Dearborn conduct a recall. Then it realized that the replacement locks were just as bad as the ones that they were replacing, so Ford of Mexico asked Ford to extend the warranty. Ford said no. So what we have here is a situation where Ford winds up saying, look, safety is the only way that we can be held accountable. And the bottom line, however, is that when we went through 100 years of jurisprudence in our opening brief, explained that that's never been the standard in California, and there is some loose language that could be read to say that, and certainly other cases after Doherty do say that, that's wrong. There's no jurisprudential basis for that. And in fact, the policies that inform those cases absolutely don't support it. For whatever the reason, Ford did something that was rather unusual in this case. After fighting us for four years over that very issue and prevailing on that issue when the court below considered it a second time, it then withdrew that argument, said that plaintiffs and their amici are essentially correct, that safety is not a prerequisite, but rather they offer a new argument now. That is, the very existence of a warranty, according to Ford, and this is on page 31 and 32 of their brief, is in effect a disclosure of the potential existence of defects in the vehicle. And therefore, because of this disclosure, and they cite the cases in New Jersey and Missouri and Wisconsin as support for this, that somehow that insulates the manufacturer from any kind of fraud claim because, in effect, they've disclosed the very information that we allege is concealed. They then ask the Court to do something that has been prohibited by Erie Railroad v. Tompkins, that is, to adopt that rule for California based on this policy that they think the Supreme Court of California would embrace. The problem with that is that Seeley doesn't do that. Seeley had made clear that those arguments would work in the context of a negligence claim, strict liability claim, where a manufacturer has no control over these issues. Somebody says this doesn't fit my needs after the fact, that doesn't work. But whereas here there's intentional conduct where the manufacturer has complete control over whether they're going to disclose or whether they're not, that they have to take responsibility for that, that they can't say that this is outside of our control because it's absolutely not, it's an intentional act that has to be done, it's easy to do. And, therefore, the economic loss doctrine, which is the argument that manufacturers have been making since Doherty without saying it, characterizing it as such, doesn't apply. And the reason is that you can't benefit. It's a — California is one of the States that codifies the juris — maxims of jurisprudence. One of them is that you can't benefit from your own wrong. And as Justice Traynor had observed in a case called the — the name escaped me — Ward v. Taggart, a case where, in essence, a real estate agent offered to sell some property to a buyer, not telling her that the buyer's price was a lot less than what the agent was offering it for. Land was actually worth what the agent was telling her the seller was selling it for. And pocketed the difference. The Court found that even though there was no damage to the plaintiff, the policy in this State is so strong that not only did they award the difference, that is, the money that the real estate agent, who had no fiduciary relationship with the — with the buyer, had to reimburse, but that punitive damages could be awarded on top of that. It's just not something that is unclear. It's crystal clear. You're down to about a minute. I'm sorry, Your Honor. I wanted to reserve some time for it. Yeah. We've got one — one left, so just wanted to alert you to that. I'll just use that for rebuttal. Yes. Thank you. Thank you. May it please the Court, my name is John Thomas. I represent the Appalachee Ford Motor Company in this case. This case begins and ends with Daugherty. Daugherty — in Daugherty, Honda sold vehicles with allegedly defective engines for seven years without disclosing the defect to any of the purchasers. The plaintiff, for the first time, I believe, suggests that perhaps Honda didn't know of the alleged defect, but the opinion says, the complaint alleges Honda, despite constructive and actual knowledge of the defect, deliberately failed to remedy it. And failed to warn the public of the risk. The plaintiff alleged in Daugherty that there were hundreds of thousands of failures caused by the alleged defect. The — one of the — one of the plaintiffs in the case experienced a total engine failure at 57,000 miles, the same — coincidentally, the same mileage at which Mr. Smith experienced his engine failure. A vehicle with an engine failure, complete and total engine failure, can't be moved. There is no — literally no principled distinction between this case and Daugherty. In Daugherty — and that's really the end of the story, because, as this Court knows, a decision of the Intermediate California Court of Appeals is binding as a matter of California law in a diversity case, unless there's good reason to believe that the California Supreme Court would decide the issue differently. There's absolutely no reason to believe that the California Supreme Court would decide this issue differently. On the contrary, Daugherty is consistent with the — with the law that's developing nationwide on this issue, and all of those cases, most of those cases, are cited and discussed in our brief. Moreover, Daugherty actually makes common sense. As the Daugherty — as the courts in Daugherty recognize, in fact, accepting the theory underlying Daugherty and underlying this case would effectively revolutionize the way motor vehicles are sold and distributed in this country and would, in fact, make illegal virtually every sale of a motor vehicle transaction that occur — is occurring today as we speak, because in none of those transactions do any of the sellers or the manufacturers disclose all or any of the defects that might or might not go wrong during the life of the vehicle and that might or might not be corrected under the express warranty, depending on when it occurred. We joke about planned obsolescence, but suppose you had a car that the manufacturer knew would stop working one day after the warranty period. People — I'm sorry, I didn't mean to cut you off. I take that not to be the case, but suppose you had that case. People have asked me, can't you think of a situation where there might be material information that a manufacturer might have to disclose even though the warranty has expired? That's exactly the example that I give. If that were this case, this would be a different case. And so what I'm really looking for — you quickly accept the premise of my question — what I'm trying to do is, where do we draw the line between that case and what we have here? And I don't know exactly where that line is drawn, but I think the significant fact here is, again, Doherty, that the plaintiffs had 8 months, by the way, and this is significant. They had 8 months after we filed our motion to respond and to distinguish this case from Doherty and to distinguish this case from the run-of-the-mill motor vehicle transaction that's occurring today as we speak. Wherever the line is, it's not — Doherty clearly establishes that as a general rule, the way in which motor vehicles are manufactured, sold and distributed today is not a deceptive practice under the UCL. It is not fraudulent under the CLRA, and it does not constitute common law fraud. And the reasons for that are suggested by Doherty, and they're developed at length in our brief. And I'm surprised that Mr. Fazio thinks we're changing our argument, because the district court denied our motion for judgment on the pleadings precisely to give them an opportunity to demonstrate why the information at issue here was material, even if it didn't relate to safety. And so we — we produced a mass of evidence to show, essentially, that this — that this is nothing but a typical run-of-the-mill issue. Every vehicle has a number one warranty problem. Every vehicle has a number 10 warranty problem. Every vehicle has a number 20, 30, 40. This — at the time Mr. Smith purchased his vehicle, this was not even the number one warranty problem. It was below transmission assemblies, for example, which cost almost $2,000 to repair. And so the issue, the fundamental issue — and I agree, because I have to agree that in a fraud case, materiality can relate to things other than safety. There's no question about that, and I've never denied that. But the issue that — the real issue here that the judge gave them an opportunity to address and that they haven't even attempted to address is why the information they're talking about in this case is, in fact, material. And they've not been entirely clear about this, but they're — they have to be claiming one of two things, that Ford had an obligation to disclose everything that it knew might go wrong with the vehicle during or after the warranty period, or it had an obligation simply to disclose this one defect, arbitrary — arbitrarily selected, perhaps. And our evidence shows, without any contradiction from them, that whichever of those disclosures they're asking for, it is not something that a reasonable consumer would rely on. If they're claiming that we should have disclosed all of the defects that might be subject to the express warranty and that might or might not occur to any particular plaintiff, Mr. Smith himself testified in his deposition that that information would be useless and confusing. His testimony is confirmed by our expert, Professor O'Gwin, who said, yes, in fact, a — a encyclopedic disclosure of everything that might go wrong with the vehicle during or after the warranty period is not something that consumers want or would rely on or that would help their decisions. If, on the other hand, they're claiming that we should have disclosed the specific defect that happened to happen to Mr. Smith and Ms. Kline, it would have been affirmatively misleading, as Mr. Smith's testimony itself shows. He says, if the dealer had told me that there was a .1 chance or greater that the ignition lock would fail, I wouldn't have purchased the vehicle, because that would have suggested to me that there was something wrong. But our evidence shows that if he had gone and purchased another vehicle, the chances are quite good that he would have ended up paying twice as much over the course of 5 years to maintain and repair his vehicle as he paid over the course of his 5 years of ownership. The evidence is that he paid an average of $110 a year to maintain his vehicle, because the only thing in the course of 123,000 miles that went wrong with his vehicle was the ignition lock. A newer vehicle, his was a 2003 vehicle. The evidence in this case shows without dispute that a newer vehicle, a 2008 comparable vehicle, owners can expect to pay twice that much over the first 5 years of ownership. And so if Mr. Smith had decided not to purchase this vehicle because of a disclosure about one component, the chances are very good he would have gone and purchased another vehicle that had its own top ten list, which may not have included the ignition lock, but might have included the transmission or the controlled assembly or any of the other thousands of components of the vehicle, and he likely would have paid more overall in the first 5 years of ownership than he paid for his focus. And once again, Professor O'Gwin confirms that a negative disclosure like this likely would lead to an unwarranted focus on one aspect of the vehicle and would lead to less rational decision-making. No reasonable consumer would rely on information about one arbitrarily selected component of a vehicle, because if he or she did, he'd run a huge risk of buying something else that's going to cost more to repair and is going to offer less of what he or she likes to less of offer less of what attracted the consumer to that vehicle in the first place. I have to spend – I should say a few words about the safety issue, if only to make it clear that although plaintiffs allege that the defect in this case can prevent the vehicle from being turned off, they presented our expert testimony established that it – that the alleged defect cannot prevent the vehicle from being turned off. The plaintiffs I heard for the first time today say that they consulted with experts before they ever filed this case in 2006. So if it were true that, in fact, the defect could prevent the vehicle from being turned off, they had since 2006 and 8 months after we filed our motion for summary judgment to present expert testimony to that effect, they did not. There is no evidence in this case that the – no competent evidence in this case that the alleged defect can prevent the vehicle from being turned off. Mr. Fazio is likely to point to consumer complaints, some consumer complaints in the record, but there's no evidence. First of all, the evidence is that most of those, if not all of them, are probably attributable to other problems like electrical problems, and there's no evidence whatsoever that any of them, any of those problems reported by consumers were caused by failure to turn the vehicle off. With respect to not being able to start the vehicle, there have been 1.6 million of these vehicles sold since 1999. The earliest ones have been on the road for more than a decade. By the time – by the time filed – actually, more than a decade now, but at the time plaintiffs filed their response to our motion for summary judgment, these vehicles had been on the road for a full decade. There's no evidence of any injury ever resulting from any of these. In fact, the evidence is that there are lots of things that can prevent vehicles from being started or can – or that can immobilize a vehicle after they've been deliberately parked, things like dead batteries, flat tires, engine failures, transmission failures, oil, complete oil leaks. There's no evidence of any injury ever being caused to anybody as a result of an inability to start any vehicle. In fact, if Justice Breyer is right and the Fifth Circuit is right, there have been more injuries in those 10 years from ingested toothpicks than there have been from an inability to start a vehicle. I presume that if you had to leave your key in your car and you couldn't get – because you couldn't get it started and you couldn't get the key out, you pretty damn well would be tough for a burglar. Exactly. I mean, if you couldn't start your own car, how are they going to start it? And the issue here, again, is materiality, as Mr. Fazio likes to say. So the issue really is would a reasonable person consider that remote, that highly remote risk of injury to be reasonable? The behavior of the plaintiffs in this case show without question that it's not. Ms. Klein started to have problems turning her key. It was getting harder and harder to turn. She went on the Internet and she read about instances where people ultimately were unable to start her vehicle. What did she do? Did she take her vehicle in to get it fixed? No. She kept driving it. She demonstrated by her very conduct that she did not perceive a significant safety risk. The same thing with Mr. Smith. He had a problem – his problem occurred at 57,000 miles. The tow truck driver told him, oh, this is a common problem with Ford ignition switches. They replaced his ignition switch. He drives it for another 60,000 miles and he still, at the time of his deposition, had no interest in selling his vehicle. The conduct of these two plaintiffs demonstrates what's obvious. Is this a hassle? Yeah. It's a hassle if you go out and you can't start your vehicle for any reason, just like it's a hassle if your furnace conks out on Christmas Day or your hard drive on your laptop fails and you lose all your data because you weren't smart enough to back it up. There's all kinds of things in life that are a hassle. And if it happens to you, this is one of them, but it's not a safety issue. Counsel, can you address this issue that was raised about the undisclosed warranty program? Oh, yes, sure. California law prohibits what's called a secret warranty, which is when essentially a manufacturer tells its dealers if somebody comes in with a particular problem, you can fix it under warranty, but it doesn't tell people that that program is available. But that law specifically permits ad hoc adjustment programs. It's not intended to prevent goodwill adjustments. If you have a good customer who the dealer has a good customer who's bought five vehicles at the dealership, comes into the dealership regularly for maintenance, never goes anywhere else for service, and he has a problem with his or her vehicle, the dealer needs to have flexibility to give an accommodation to that customer on an ad hoc basis. That's all that the Ford program does. It gives dealers flexibility to provide after-warranty assistance to customers following certain general guidelines. You consider, was he a good customer? How many vehicles has he purchased? Does he have a service done at the dealership? As opposed to somebody who's never been, for example, who's the plaintiff's maintaining that essentially what Ford was doing was winking to the dealer, if you will, and suggesting that they fix these things that people came in under the ad hoc provision. And that amounted to, in effect, a secret warranty. There's no evidence of that. I mean, they point to evidence of 16,000 ignition locks being replaced. First of all, the 16,000 number is not entirely reliable, but it's 16,000 out of 1.6 million vehicles. And that 16,000, by the way, includes 2,000 to 2006 vehicles, not just the 2003 vehicles that are at issue here. So if you will. Roberts, let me ask one question about the motion to certify. Yes. And you've got separate reasons for opposing that. Let me take out the reason that complains about the formulation of the questions and simply ask, would it be appropriate or why wouldn't it be appropriate to refer a State law issue as to which there has been some, at least some, disagreement amongst the district courts to the California Supreme Court, particularly in a context where, because of CAFA, most of these cases are winding up in Federal court and we're ill-equipped to adjudicate in California law. In particular, you have a panel here of three judges, none of whom are from California or have to live with California State law except on our frequent trips here. So why really shouldn't this be a candidate for certification? It's a candidate. It's not a candidate for certification because there's controlling law. There's no principle distinction between this case and Daugherty. If this Court thinks there's room, I mean, if the Court actually thinks there is some principle distinction that might be significant between this case and Daugherty, certification might be appropriate. But the law is, there really, I mean, there is controlling law. This Court's followed that law both in published opinions in Clemens and its unpublished decisions. This Court certainly has not displayed any uncertainty about what Daugherty says, nor do I think that there's any reasonable or principle distinction between this case and Daugherty. The law is settled in our favor. The law certainly is not settled in plaintiff's favor. And so I don't see any basis for certifying a settled question of law to the California Supreme Court. Did that answer your question, Your Honor? No. Roberts. Thank you, counsel. Your Honor, with respect to the last issue first about the propriety or suitability of these questions for certification of the Supreme Court, this is actually an issue that we discussed with Ford's counsel early on in this case, where Ford was urging us to adopt a procedure by which to do that. In fact, it was the subject of a CMC statement where Ford was proposing just that. And I take it you opposed it at that time? We did because of the law. The circumstances are reversed. What do we take of that? Well, no, I'm not being hypocritical, Your Honor. At the time, it made no sense because of the procedural posture of the case. We explained that if and when it was appropriate, we would, of course, agree to it. We'll take the motion under advisement. Go ahead with the rest of your argument. With regard to the unpublished decision in Ollstreicher, Ford actually requested that the Court, for that reason, to clarify the issues in this case, the Court denied that request to publish. And the idea of Doherty being clear, controlling authority, I think, is made evident by the fact that it's not by virtue of the split of authority, which courts are now explicitly recognizing, and the Court below actually deciding exactly the same questions opposite ways, and saying that the Supreme Court needs to weigh in on this as the only way. The issues about the evidence, or lack thereof, one of the things that Ford's expert, who never spoke to the chief engineer of the lock division, who Ford assigned to these special teams, they never communicated, did two things. One said that he couldn't find a single complaint in Ford's databases. We had no trouble finding about a dozen. We asked the chief engineer about that, and he distinguished some of them on the potential basis that they said ignition switch, a term that Ford uses for the lock as well. But several of them, he stated emphatically on the record in deposition that, for example, when Ford instructed the dealer to replace the lock, the ignition lock, because the customer had complained and the dealer had verified that they couldn't stop the vehicle's engine, there was no question about it. The Court decided that that was inadmissible hearsay, notwithstanding the fact that, among other things, we were submitting it not as hearsay, but to rebut their expert's contention that no such records existed. The other thing is the ---- Alito, you're over your time, so why don't you make your last point and then ---- The last thing, Your Honor, is as far as experts go, the calculations that he came up with, we've explained how they're wildly off, 500 percent difference between Ford's analysis and the expert. And the reason that these numbers, 10 percent is the highest, the worst performance we had over the life of the vehicle. Twelve percent is what we had in three years. And, well, I'll leave it at that. Thank you both for your arguments. The case has heard will be submitted for decision, and we'll be in recess for the morning. Thank you. Court is adjourned. This court for the session stands adjourned.
judges: Ezra, Thomas, Clifton